May it please the Court, Patricia Urquhart for the Plaintiff Appellate. Good morning. Good morning. The disciplinary actions of public employers are entitled to great deference, but only when they reflect a strict compliance and observance of the constitutional, statutory and contractual rights of the public employees. We believe that the plaintiffs have presented a very robust and abundant body of evidence here. That the officials of the City of Pullman not only failed to meet these obligations, falling a little short, but actually demonstrated outright disdain for these standards. Well, okay, let's, I mean, I know that we've got the appeal from, there were certain things that you lost on, certain counts you lost on summary judgment. Were you the trial lawyer? Yes. And then you got a jury verdict in your favor on other things, and then the judge set aside the jury verdict. So looking at the jury verdict, which is the issue that concerns me the most here, you're entitled to all inferences in your favor. So how did, where did the district judge get that wrong? I mean, essentially there has to be no evidence as a matter of law to set that aside. So he got it wrong because he came back in after the verdict was rendered. And he said that the affair was the only issue before the court, essentially, before the jury, and that complaints about the appearance of an improper sexual relationship in a workplace were inadequate, were an inadequate vehicle. Doesn't the statute talk about unlawfulness? Yes. What was unlawful about the affair? There wasn't, the affair wasn't at issue. I'm not, I said, but that was what sort of precipitated the whole thing. It precipitated it. And their concern, Reber's concern, and the ones who supported him, was that the way in which they, the chief and the human resources person conducted the investigation was in retaliation for their engaging in, participating in and opposing unlawful practices. But what was unlawful about the underlying? That's probably the single most important issue for us to resolve today, and that is the fact that it was not the affair that was put to the jury. That was not the question that was put to the jury. And I have copies, if I may approach. Well, no. We have to look at all the evidence, and we have to, if what the jury found, if there is some theory that whether, even if you didn't argue it, if there was, because the jurors are told what the attorneys say is not evidence. Listen to them, but that's their theory of the case. So under the evidence that the juries had is, you know, obviously when, if you're a supervisor or people come and complain to you and they say that, I think that, you know, if they're concerned about, I've seen sexual harassment cases where people complain that someone's getting unfavorable treatment because they're having sex with someone that's a supervisor or other people feel concerned about, they feel like they can't do certain things in the workplace because the person that's having an affair may be empowered to do other things about it. So what could the jury have found that would have been, you know, obviously a supervisor, if my staff comes in and says, well, you know, two of your law clerks are having an affair and the other law clerks are really uncomfortable about that because they feel like they're lording it over us or we feel like someone's getting preferential treatment or maybe it's, you know, your senior law clerk that you put more work with is having an affair with one of the junior ones and all of that. So, I mean, there could be some unlawful conduct that isn't per se that two affects the workplace, right? And here's the straw man that we've been arguing against from the beginning. In all the different forums in which the plaintiffs have presented this issue, they have always said, they have consistently said, and the city of Pullman has never been able to effectively rebut it, that our argument for protection and for protected class status under LADD and Title VII was the fact that they opposed the corrupt investigation of Riber. The investigation represented retaliation for earlier expressions of concern. So, say that again. So, the theory was not, it wasn't participation. No. That, I thought so. Participation, yeah. I didn't think it was participation. No, no. It's really opposition, right? Opposition to the corrupt investigation. Say that again. To the corrupt investigation. To the corrupt investigation of Riber. And why was it corrupt? Because the city of Pullman knew very well that there had been concerns expressed about this affair, and they had actually assigned Captain Riber to deal with the impact of the affair on Tatum's performance. But even if you've got evidence of an affair, and even if Captain Riber has got the green light to talk about the affair and how it's affecting his staff, you have additional allegations that Captain Riber is himself engaging in sexual harassment. Doesn't the city have an obligation to investigate that? They do, but they knew there was more to the story, and they willfully ignored the most single significant thing about these events. They had a public servant with 18 years' experience with a blemish-free record. And all of a sudden, after the affair is known to the city, and it was known to the city, because Chief Wilkins was told about that October 2008 meeting as promptly as it occurred. Right, but even if the chief says, has got someone is claiming that Riber is engaging in sexual harassment, and somebody says, well,  doesn't the chief have to resolve that in some way? Doesn't he have to investigate that? And if he's investigating it, what is it that you have to prove in order to show that it's retaliatory? They demonstrated disdain for the issue altogether. Sires and Wilkins refused it. Didn't answer my question. What is it that you, don't you have to prove that Chief Wilkins knew that all of the allegations against Riber were false and that he investigated it anyway, even though he knew it was false? He knew that the most serious allegations were false because he received. How would he have known that they were false? Because James Turpin came to him on April 28th and said, this man's a sexual predator and has been asking for naked photos of his subordinates' wives. Chief Wilkins called Eric Taylor in. Did he use the word sexual predator? He said that he had asked for sexual favors of the wives when he was on the telephone. Well, I think part of the reason is, I mean, I'm feeling like I can articulate better what the jury could have thought than you can. You're too close to this case in some ways. And in terms of, you have to look at, there's causal, when you look at discrimination cases, a jury is entitled to, they can look to temporal events, how they happen here. And the jury could have arguably believed that the chief knew that it wasn't true or that someone else in the department had put that up to starting, hey, let's investigate Riber because of this. And they could, there's a lot of smoke here. And the jury could have found fire in certain ways, feeling like these people are unscrupulous, that they only started this investigation. They knew that there wasn't anything to it. They only started it because he was being, he was making comments this other way. And they, you know, they could have put, that's how they could have connected the dots. They didn't have to follow your way to connect the dots. And so you keep getting stuck with your way. So is there enough evidence, is there any theory that if the jury, was there enough evidence there that the jury could have believed that the chief completely, that knew that it wasn't true and entered it with the idea, like I'm going to get him because I want to get rid of this other problem in terms of how the dates all line up. And you put into evidence that this, that Riber had never been investigated before. And I think the other officers that got investigated as well, you put in evidence that all of them had unblemished careers, right? Yes, they did. So isn't, couldn't the jury have taken a different approach than even whatever you argued and found that? It wasn't a matter of what I argued on behalf of these parties. They had before them evidence that on April 28th, James Turpin accused Riber of very serious, inappropriate conduct in the workplace. Very serious. And the chief knew that Turpin was lying? Yes, because the reports were attributed to Eric Taylor. Excerpt of Rector 50 is the Turpin memo. And he knows that Taylor is lying because of the Sires investigation? Taylor wasn't lying. Taylor was called in before Chief Wilkins on May 3rd or 4th of 2009 and asked whether it was accurate that he had told Lieutenant Turpin that he'd been asked for naked photos of his wife. And he said, that didn't occur. The jury heard that. And he said it several times. We asked him, but we didn't learn that because it was withheld from us by the city of Pullman for 16 months. We had to wait until Eric Taylor appeared in the grievance arbitration at the end of September of 2010, 16 months later, because we had no other discovery device available under PECBA in Washington. He took the stand and we said, you know, what is your role in this case? And he said, I was called in by the judge, or by Chief Wilkins, and he was, he asked me whether this had occurred. I said it did not occur. And we asked it a number of different ways in a couple of different proceedings. So the jury, so what you're saying is the jury could have believed that that's what Taylor told the Chief and the Chief just went ahead and instituted it anyway. Yes. They did it with animus. How did you, since Chief Wilkins had died before this trial, how did you show what Wilkins knew or what Wilkins thought? He testified under oath in both the grievance arbitration and the unfair labor practice proceeding. And you were able to introduce that testimony at trial? Yes. And the, he, and Wilkins admitted that he knew about this affair, and he wanted to take it a different direction. For me, tie this all the way back to the core of the statute that you were relying on, you know, the Washington Law Against Discrimination. How does this all rise to an opposition claim? The opposition, and I should say as a preliminary matter, it was good faith opposition to the sexual harassment investigation that appears all the way through our exhibits on pages 115, 119, and 108. If you take out the good faith participation, it's good faith opposition to the investigation. And the investigation. So good faith opposition to the investigation of? Rybert. It was a corrupt investigation because Wilkins knew full well that Taylor repudiated that trial. And that's the only thing that Wilkins could have investigated this for? He knew that it was a false allegation. He handed that off. You didn't answer my question, okay? Was there anything else that Wilkins could have investigated Rybert for other than the question of whether he had asked for naked photos of Taylor's wife? Not that meets the threshold of a Title VII complaint. There were no other serious allegations against him. He can't investigate any of the other questions about harassment of Tadima or anything else? He looked into it. But in looking at Tadima's complaints against him, they're specious. They're clearly on their face, specious. There's nothing there. So he had no basis for investigating that? No, he did not. He did not. He just did not. And not only did he have no basis, but he intentionally used the complaint as a vehicle. So investigating Tadima's complaints, that is retaliation against? Yes. And that's what the jury had to base it on? Yes, because in doing so, he and Sires, Karen Sires, the human resource officer, used Turpin's memo of April 28th to frame 15 questions put to 22 members of the department the first two weeks of May of 2009, and all of them presumed that he had, in fact, asked for naked photos of their wives and asking merely whether you, too, had been asked for these same things. They knew at the time those questions were asked that that had never occurred, because Taylor said that had never occurred. They had no valid basis for believing that there was any overture like that in this man's conduct at all. And they went forward with it anyway, demonstrating animus and demonstrating that they were going to use anything they had that they could. And also, we need to account for the fact that they didn't go to Operations Chief Heston, who had been present when Ryber was interacting with Tadima. He'd been present in the prior meeting of October 2008. He knew that there was something fulminating in this workplace and concerns. We do say it is, you know, we acknowledge the decision of law that merely complaining about a workplace relationship is not adequate to support a claim, but the instructions, instructions 9 and 12 and the verdict form say each plaintiff is asserting a claim that he engaged in or was engaging in activity protected under Title VII that is good faith opposition to a sexual harassment investigation. It's not to the affair. It's to the investigation. The affair was a precipitating event, and it is the benchmark by which we establish whether the investigation was corrupt in that they refused. There's not a single word in scores and scores and scores of pages of interviews and findings. There's not one single question put to anybody about that affair that might have established animus on the part of these people to bring these judges. You pretty much exhausted all your time over the jury's, the judge's ruling on the 50B. Right. But you had a couple other issues that you raised. We had lots. But I don't want you to go through all of them. Participation, I think, is we think is presumed. These people were ordered in to take part in this investigation. They didn't have a choice. I'm talking about your appeal from the grant of summary judgment. Oh, the grant of summary judgment. We do what we would like to observe. There's no provision of LAB that protects, withholds protections from employees merely because they are refuting rather than supporting the validity of a claim. And that's what we were essentially coming forward to do. You had a First Amendment claim, and I think that the court found that it wasn't as a matter of law. There was no public concern. Right. And I think your point was that it's a small town, and there were actually news, there was a lot of coverage on this. Yes, there was. That was sort of the Peyton place of Pullman. Sure. And so maybe if it weren't a small town and maybe if the newspaper hadn't written those there wouldn't have been something of public concern, but that was enough to get back by summary judgment. Is that what it was? And we believe that whether a mid-level manager in a fire department in a city of that size especially was engaged in that kind of conduct as alleged with his subordinates' wives was clearly a matter of great public concern and consternation. Why isn't that just all that goes on in the fire department? Excuse me. Why isn't that just nothing more than, you know, what's going on in the fire department? When a mid-level manager is Why is that a matter of public concern? In public life in this day and age, in public employment, for a mid-manager to be charged with demanding naked photos, crotch shots of his subordinates' wives, I would think that the community would have some concerns about that. You had one other claim that I was curious about. You had an equal protection claim. Yes. I just want to know what's your theory on that equal protection claim? We had two different classes of employees. Is it a straight equal protection, a single, you know, one person claim, or is it a selective prosecution claim? No, it is not a class of one claim. So what kind of claim? Is it a selective prosecution claim? Essentially. Essentially, but not really? Excuse me just a minute. We had two different groups of employees in this workplace. Those that were accusing Reiber of very serious misconduct, and we had a group of employees who were defending Reiber, saying that the inflammatory charges were false and they were a sign of a corrupt investigation. At every turn of events in this case, the city of Pullman gave deference to the group of employees who came in to go against Reiber because it pleased them to do that. That's what they were about in going after Reiber and knocking him back. And what kind of equal protection claim is that? There is, we have cited in our brief the fact that a single group of employees should It seems like something that the city would have to investigate, and somebody's going to win and somebody's going to lose. That doesn't make it discrimination. We believe the record reflects that virtually everything that Reiber's accusers said against him were taken at face value without any meaningful investigation. There was no interview of any women. There were no specifics about what he said or did. It was all just in the window. You're going to try and get it on the basis of race, religion, gender. What's the basis here? That they had spoken out. That sounds like a selective prosecution claim. Yes. Or a retaliation claim. It doesn't sound like an equal protection claim. They were all treated less favorably than all of Reiber's accusers. They were run through the ringer of this Kenaur investigation for a full six, eight-month period, and that was held over their head for a long period of time. They were all branded with that wolf pack allegation, and that cannot be overstated. I've given you some extra time, but I've got to move on to the other side. Okay. Thank you very much. Thank you very much. Good morning, Your Honors. My name is Mike Bolasina, and I'm here on behalf of the appellee, the city of Pullman. I think the overarching issue, the phrase that people have been using, is basically what constitutes protected activity under Title VII and the Washington Law Against Discrimination. Well, and I've got real concern about setting aside this jury verdict. I'm just going to tell you that right out, and I'm not sure. I don't really care so much what the parties argued. I care what the jurors could have, is there any, could the jurors have found with the evidence that was presented any legitimate support for the verdicts? And actually, Judge Rice found, and we strongly support, the answer is no. Well, you obviously, well, he thought it should go to a jury, and then he kind of went back and said, oh, shouldn't have. But there's a lot of smoke here, and there's a lot of things that the jury could have concluded that not necessarily either of you argued. And that really concerns me here after. And when you set aside a jury verdict, if there's any way that it can be, you can pull together a theory that could be supported, it doesn't have to be the one you argued, it doesn't have to be the one they argued. I agree. And the jury was free to believe or disbelieve things. You argued them different ways. The jury was, you know, free to completely believe that the chief was motivated and orchestrated that whole thing. And I don't know, there was discussions about causation, but in employment cases you can, there's some bad temporal evidence for your position. Actually, I disagree with that, Your Honor. I think that Judge Rice actually looked at what was the testimony before the court, what the evidence was in the documents. Well, and if you had a court trial, I would agree with you. But when you have a jury trial and the jury doesn't look at it the same way that Judge Rice, you know, it seems to me that Judge Rice was not considering every inference that the jury could have taken from that. I think he considered every reasonable inference from the evidence, but he did not consider what he considered unreasonable. So it's unreasonable to think that the city had to investigate this, even if the jury thought after hearing everything that it was basically trumped up, that the chief knew that he didn't have to, that the chief had somehow, you know, this was a patent place here, but somehow that the chief had somehow just run the investigation in a certain way to make it look like he was doing something legitimately and dragging everyone in. Actually, the thing is that Judge Rice did not find as part of his order, nor did we argue that Chief Wilkins' motives were pristine. But the key for these causes of actions is not did the chief. What if the chief knew that they weren't, that he knew he was doing the investigation for the only reason that these people spoke out and he knew that the things he was investigating were not true? Is that a legitimate exercise of the chief's power? Actually, I think that that question is irrelevant. The question is, was the chief initiating a disciplinary matter because of Riber's protected activity? That's the question that Judge Rice thought was answered no, there is no evidence to support that, that no reasonable jury could conclude that Chief Wilkins' motivation for doing anything. Well, let's talk about temporal. Did the investigation happen before Riber made these, wasn't happy about the affair? Or did it happen temporally? I mean, I would agree if it had happened, if the investigation of Riber was before all of this, that's a lot better for you. But what Judge Rice found was that there was insufficient evidence for a reasonable jury to even conclude that Riber engaged in oppositional activity with regard to this affair. The evidence was that Riber participated in a meeting with other supervisors where Lieutenant Fisher said there is an appearance here of an affair and it makes us uncomfortable and we'd like to know how to handle it. And Chief Heston said that I will handle it and Riber agreed that that was a good way to deal with the situation. Then when Chelsea Tatema rotates on to Captain Riber's shift, he says both in his testimony and in the documentation that he didn't have an issue with Chelsea Tatema and Andrew Howell when they were on his shift and that he did counsel her about issues related to her probationary status, but he did not actually ever raise the issue of an affair with Chelsea Tatema, that he was counseling her about other issues related to her doing chores and going out to get food for the rest of the crew and things like that, but he never raised the issue of the affair. And then when he submits his written rebuttal when he is being investigated for a hostile work environment, he says that he did not credit the rumors about an affair because he did not believe that they were romantically involved. And when you look at this, and this is what Judge Rice concluded, this does not constitute oppositional activity under either Title VII or the Washington Law Against Discrimination. This is not forcefully opposing something that you think is unlawful under either of these statutes. So that, I think, is key, is not was Chief Wilkins, and I think that this is perhaps what confused the jury as well. Chief Wilkins, the pristineness of his motives in doing this were not at issue. For purpose of these two statutory causes of action, a reasonable jury had to conclude that Chief Wilkins disciplined Ryber, initiated this investigation because of Ryber's oppositional activity, not because of any personal animus that he had against Ryber, and there was evidence of that, not any animus he had against Ryber in his role as a union president, and there was evidence of that. Well, he was in the union. He had never been disciplined before. There were all of those issues that were before the jury. And what if the jury just thought that that's what the chief – And Judge Rice concluded in granting our motion that no reasonable jury, based on the evidence before them – Except 12 people did. I don't think there were 12. However many there were. Six days. Yeah. But the thing is, is that if there was automatic deference to whatever a jury did, there would be no Federal Rule of Civil Procedure 50. So where does the claim, from your perspective, and I'm not quite sure I follow the plaintiff's argument, where does the opposition come into play? What forms the basis of the opposition claim from the plaintiff's perspective? Well, those three things. Captain Ryber's participation at this meeting in October of 2008 with Chief Heston. There was no mention of the affair at that. No. Actually, that meeting was about that she is visiting the station on her day off and bringing him coffee and joining them for lunch, and it makes people uncomfortable because there's these rumors that there may be an affair. The second issue is that Captain Ryber, when she rotated onto his shift, counseled her about performance and attitude issues. And then third, when Captain Ryber was being investigated, he submitted a written rebuttal, and all these are documents in the record, where he says that there were rumors that they were having an affair. He did not believe them, but there was this appearance of this uncomfortable closeness between them. And that's, for Captain Ryber, that is the alleged protected activity or the alleged oppositional activity. And what Judge Rice found was that based on the testimony that was introduced in trial and the documentation that came in as evidence, that does not rise to the level of oppositional activity as protected under either statute. And with Captain Ryber, the only statute he made a claim under was WALAD, not Title VII. The issue for the other five plaintiffs is actually quite different because what Judge Rice found in his order was, when they submitted the Loudermill Statements, that that could qualify as protected activity. But what Judge Rice found was, is given the content of the Loudermill Statements and the testimony and other evidence that came in on that issue, no reasonable juror could conclude that what they did was protected under either Title VII or the Washington Law Against Discrimination. And with regard to that issue, he first took a look at these Loudermill Statements. And in his decision granting the renewed motion for judgment as a matter of law, he quoted extensively from one of them where he said, this goes well beyond what should be considered protected activity and is really sort of character assassination against only those people who the plaintiffs knew had participated in the investigation against Captain Ryber and had provided time for information. But the district court seems to say that the defendants were legally required to investigate Turpin and Howell's sexual harassment claims and that their legal requirement to do that precludes finding an unlawful retaliatory animus. How can that be right if the chief knew they weren't true? Why are you legally required to investigate things that you know are not true? Actually, you know, I don't agree that there is some statute that legally requires a party to initiate an internal investigation. I think that given supreme court precedent. But didn't the district court say that? Yes, but it's prudent in the modern era that if a complaint is made alleging a violation of the discrimination, retaliation, or anti-harassment laws, that the employer actually look into it because the risk of being held liable for the conduct goes way up if you actually somehow ignore the complaint. If you do nothing. Excuse me? If you do nothing. Yeah, if you disregard it. And so the fact that a formal complaint was served on the city alleging retaliation is what basically motivated the city to do it. But is it conceivable that the chief and others could have been involved in some way to get this thing? Is it conceivable that when you have a duty to investigate, you could also do so in a way that would run afoul of Title VII or I don't know how you say it, but WELL-AD. WELL-AD. WELL-AD, yes. Are you just saying because someone files a complaint, you just have to do it? Well, if somebody files a complaint, you're going to have to be able to articulate a very good reason not to initiate an investigation. All right, but could you do the investigation in a way that would run afoul of Title VII or WELL-AD? If I think appellant's counsel was alleging that the chief knew, in fact, about the nude photo allegation that it wasn't true and still went ahead and asked all sorts of people, went forward with that. If he knew that was not true. I don't believe that that would run afoul of either Title VII or WELL-AD, although there could be other causes of action that somebody could bring. Was there evidence before the jury that this individual, that the chief had spoken to this individual and that he denied that the chief had asked, that Breiber had asked him for photos? Eric Taylor, the person you're speaking of, said various things at various times. Well, I know, but the jury's got to decide what they believe. You know, there's all sorts of things floating around here, and the jury can pick what they believe. And the thing is, is that there was evidence that, with respect to whether Eric Taylor was asked for photos, there was evidence that went in every different direction. So if the jury had to make a credibility determination, they could have concluded any one of many things. However, that was just- They did conclude that he told the chief that it had never happened. If they concluded that was the truth, would the chief have been appropriate in going ahead with that? Well, actually, the thing is, is that James Turpin also came forward and said that Captain Breiber had asked for naked photos of his wife, and that testimony was credited. But, again, you are pointing to one aspect of it. Well, I mean, how do we know what the jury did credit? Well, we don't because we can't talk to them in federal court. That's what I'm saying. So you have to look at it from the perspective of, based on the evidence that did come in, could a reasonable jury have concluded this? And the way that Judge Rice dealt with that, and I agree with it, is saying that the naked photos was one aspect of several allegations against Captain Breiber. There were allegations against Captain Breiber that, when speaking to other firefighters' wives, he asked them, how are my children doing, suggesting that he was the father of their child. Or he would ask other firefighters, can you leave the back door open for me? I'm going to go in and service your wife tonight. So it wasn't just the naked photo allegation that the city was looking into when it initially looked into the complaint against Captain Breiber. There were many allegations that it looked into. Some of them were found not to have any merit. Others were. And the fact is that Karen Sires asked people if they had heard about allegations on all the issues that were raised, and then once she got a final answer, she did her report coming to her own conclusions. And she was actually found not liable by the jury for any kind of retaliation. And the discipline of Captain Breiber was based on her investigation and her investigation report. So the case is so factually complex. The fact that they did not find her liable for what she did, she's somewhat removed from some of the other things. Is it possible they still could have found that other people did things wrong and gave her wrong information? Well, they could have. Yeah, they could have found that certain people gave Karen Sires inaccurate information. But, again, that doesn't – it's a big leap to go from there to actually holding the city liable for violations of either Title VII or the Washington law against discrimination. And I think that you're pointing out the real challenge in this case is it's so factually complex with so many issues involved, I think it was probably difficult for the jury to focus on just what is protected activity and whether there was any retaliation for engaging in it. And that, I think, Judge Rice saw that what the jury verdict – But for you to prevail, there has to be no way the jury could have seen the evidence to come to that conclusion. No way, yeah. A reasonable jury could not have found in the plaintiff's favor on these causes of action based on the evidence that they – All of the evidence. The testimony and the documents. And how they resolved the credibility questions. And there was no dispute here over the jury instructions. Is that correct? That is correct. Okay. So did you want to respond to any of the issues that we discussed on the summary judgment? Actually, with respect to summary judgment, I think on the First Amendment claim, that the law is not what is of interest to the community, whether it's a matter of public concern or not, because I represent cities and I know that anything that happens in municipal government becomes of interest to the public. From everything from affairs that city employees are having all the way to things that do affect operational safety. And what the Ninth Circuit has – what they've interpreted is that in order for something to be a matter of public concern, it has to affect department safety or the efficient operation of the fire department. And allegations regarding an affair between two coworkers just does not rise to that level, even though the public might be interested. But what if disciplinary actions were handled in, you know, a malicious fashion, not based, you know, if they were doing investigations to sort of further their own purposes or whatever? Could that be an issue of public concern? I don't believe it can, because I don't think that that satisfies the test for, you know, the operational efficiency of government. I think that that is – No, but if a chief were investigating all of his or her personal enemies or people that opposed him, you're not saying that the public couldn't be concerned about that? I'm saying that the public could be concerned about that, but I also don't think that that meets the test for a matter of public concern that triggers First Amendment protections. I think that when you look at what is at issue here, there are, you know, allegations and counter-allegations regarding affairs and the like, and altogether it is not a matter of public concern as that's been defined by the court. What do you understand the Equal Protection Claim to be? Is it a selective prosecution claim? I believe it is a selective prosecution claim, and I also believe that that's – What's the basis for the selective prosecution? In plainest view, that the people that accused Captain Ryber were treated better than the people who submitted statements in support of him. And I don't – There's something missing there. Well, I agree with that, that there's no protected class status that's implicated in that, and I think – Or conduct, I mean, I guess. That's like a fundamental right to the state court. The Supreme Court, I think, also said that these, you know, these classes of one or selective enforcement are not a cause of action that can arise with respect to government employment. I don't know about that, but in any event. Okay, thank you. Thank you, Your Honor. By the way, let me just add. Did you folks try to take advantage of our mediation service? We did. Preliminarily, we did, yes. But then when you got the verdict set aside, you changed your mind? No, it was actually after the verdict was set aside. Well, after the verdict was – after the verdict set aside, or you tried to mediate after the verdict was set aside? Correct. Did you meet with the mediators? We had telephone conferences with the mediators, but there was no actual meetings. I mean, this dispute has been going on for so long. It has. I mean, it must be awfully costly for both sides. Financially and emotionally, yes. Well, and attorney's fees are at stake as well, correct? Yes. The Title VII and Wile Out actually are both fee-shifting statutes. Have you – I mean, I would just – I don't mind. I can't speak for my colleagues, but, you know, this case just cries out for some sort of mediated settlement. It really does. If you have any interest in mediation, let us know. Okay. Thank you. You've got one minute, and that's it. No more. If the Court wants to know why – I gave you some extra time. Okay. If the Court wants to know why this case wasn't settled, it was resolved not two minutes ago in this courtroom when Mr. Bolasina stood up here before this Court and said that there was evidence on this record that Ryber had talked to his subordinates' wives about – or his subordinates – about leaving the back door open so he could come in and service them. There is not a single entry on this record that suggests that that occurred. And this is the kind of allegation that Captain Ryber and those who supported him have been fighting since the beginning of this case, and they persist to this date. That is absolutely untrue. Mr. Bolasina also said here a moment ago that there is a risk to the public employer in not looking into matters in the workplace that may implicate Title VII in LAT. He is absolutely correct, and that's exactly why Ryber should have been protected when he was assigned to supervise Tatema after the first of the year, when she rotated onto his shift. He'd already heard that there had been concerns about an inappropriate relationship between a young woman and a senior married firefighter. He was assigned to look at her performance and to protect her to make sure that it was not going to impact her performance. When it began to impact her performance because of her aloofness and her refusal to dine or to train or to socialize with her coworkers unless Howell was present, he was subjected to anger, a manifestation. Both Fisher and Ryber were subjected to a manifestation of anger by Howell. Howell approached both of them and said, back off my relationship with this little honey in the workplace. All right. And you're over. You're over your added time. I'm giving you 41 seconds, so you're over. Thank you very much, Ms. O'Connor. Thank you very much. Thank you. We appreciate your arguments, counsel. We really do. Thank you. The matter is submitted.
judges: Paez, Bybee, Callahan